Burt v Jerez (2024 NY Slip Op 51613(U))

[*1]

Burt v Jerez

2024 NY Slip Op 51613(U)

Decided on November 20, 2024

Supreme Court, Albany County

Platkin, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on November 20, 2024
Supreme Court, Albany County

Ariel X. Burt, individually and derivatively on behalf of FORSYTHE LTD., Plaintiff,

against
Lluis Torrent Jerez, Defendant.

Index No. 910717-23

Stradley Ronon Stevens & Young LLP
Attorneys for Plaintiff
(Eric Porter and Andrew Hamelsky, of counsel)
100 Park Avenue, Suite 2000
New York, New York 10017
Law Office of Alexander Sakin, LLC
Attorneys for Defendant
(Alexander Sakin, of counsel)
5 West 37th Street, Suite 601
New York, New York 10018
Beckett Law LLC
Co-Attorneys for Defendant
(Mark Beckett, of counsel)
45 Rockefeller Plaza
New York, New York 10111

Richard M. Platkin, J.

Plaintiff Ariel X. Burt, suing individually and derivatively on behalf of Forsythe Ltd. ("Forsythe"), moves by Order to Show Cause dated June 14, 2024 (see NYSCEF Doc No. 57 ["OTSC"]) for a preliminary injunction: (i) restraining defendant Lluis Torrent Jerez from effectuating any further sales or transfers of the assets of Atlas Renewables LLC ("Atlas") without the consent of Forsythe; (ii) ordering defendant to escrow the proceeds of any such sales or transfers, including the proceeds of a completed sale of assets to nonparty Onyx Renewable Partners L.P. ("Onyx"); and (iii) requiring defendant to provide plaintiff with an accounting of Atlas's operations from July 2023 to the present. Defendant opposes the motion.
BACKGROUND
[*2]A. Plaintiff's Allegations
The parties "have extensive experience developing solar power projects in a variety of nations" (NYSCEF Doc No. 1 ["Complaint"], ¶ 19). "In early 2020, Burt identified a tremendous opportunity to develop solar power projects in the State of New York" (id., ¶ 20), and she "brought and presented her idea to Torrent, with whom she had recently worked on a solar development project in Japan" (id., ¶ 22).
The parties "agreed to jointly pursue Burt's plan to develop solar projects in New York" (id., ¶ 23). "To further their joint venture, Burt and Torrent jointly incorporated Forsythe Ltd.
in the nation of Bermuda on March 3, 2020" (id., ¶ 24). The intention was to use "Forsythe as their jointly held parent company, which would create and own additional U.S.-based direct and indirect subsidiaries and assets related to individual solar projects [the parties] would develop in the United States" (id., ¶ 25).
The parties executed a Shareholders' Agreement for Forsythe on March 9, 2020 (see NYSCEF Doc No. 65 ["Shareholders' Agreement"]). As reflected therein, each party holds 50% of Forsythe's shares (see id. at 5; see also Complaint, ¶¶ 26-28).
In furtherance of the venture, Torrent formed Atlas as a Delaware company in early 2020 to serve as the "U.S.-based holding company for [the] individual solar projects and assets located in the United States" (Complaint, ¶¶ 29-30). "The parties thereafter memorialized this intention, and their broader goals for their joint venture, in a written Cooperation Agreement" (id., ¶ 31; see NYSCEF Doc No. 2 ["Cooperation Agreement"]).
The Cooperation Agreement, signed on June 23, 2020, recited the parties' mutual intention to jointly develop solar-power projects in the United States using Forsythe as a holding company (see id., ¶¶ 1-2). "A parent company in Bermuda named 'Forsythe' will be held 50/50 by LT [Torrent] and AXB [Burt]. In any case Forsythe will hold 100% of all of the US companies, entities and assets. So therefore, it is currently foreseen that the Bermuda company holds 100% of the Delaware company 'Atlas Renewables' which holds an LLC for each 6.5MWdc solar asset" (id., ¶ 6). Under the Cooperation Agreement, defendant was assigned "all duties [on behalf of Forsythe]," including serving as its United States representative (id., ¶ 8).
To implement the corporate structure described in the Cooperation Agreement, defendant "transferred his 100% membership interest in Atlas to Forsythe" (Complaint, ¶ 38). Thus, on or about September 3, 2020, defendant and Forsythe executed a written Membership Interest Transfer Agreement (see NYSCEF Doc No. 3 ["MITA"]), by which Forsythe "shall purchase from [defendant], and [defendant] shall sell to [Forsythe], 100% of [defendant's] total interest in [Atlas] . . . for the aggregate purchase price of one thousand dollars ($1,000)" (id., ¶ 1 [a]). The closing was to occur one week later, September 10, 2020, with the purchase price to be paid via wired funds (see id., ¶ 1 [b-c]). Under the MITA, "no certificate[s] . . . are necessary to evidence the [transfer of the Atlas membership interest]; such transfer shall be deemed effective automatically . . . at the Closing" (id., ¶ 1 [d]).
Plaintiff alleges that Forsythe transferred $1,000 to defendant for his interest in Atlas, and defendant never denied the transfer or the effectiveness of the MITA (see Complaint, ¶¶ 50-51). "To the contrary, . . . Torrent repeatedly affirmed and reaffirmed that the MITA was effective and that Forsythe fully owned and controlled Atlas" (id., ¶ 52).
"Over the next several years, Burt and Torrent worked together, via Forsythe, to further a variety of solar projects in New York" (id., ¶ 53). "Each of these projects was either owned directly by Atlas, or was organized under its own LLC owned 100% by Atlas. Either way, each such project was owned by Atlas, and each project was thereby, in turn, owned by Forsythe" (id., ¶ 54).
Burt and Torrent worked with third-parties to develop the solar projects, and, in that connection, Torrent "repeatedly represented, affirmed, and reaffirmed . . . that Atlas was 100% owned and controlled by Forsythe" (id., ¶¶ 55-56). For example, the Complaint cites a March 15, 2021 email from Torrent in which he represented to a potential purchaser (Kruger Energy (USA) Inc. ["Kruger"]) that "'Atlas Renewables is our operational company for all our [*3]developments in USA. Atlas Renewables is 100% controlled by an overseas entity which is 100% controlled by [plaintiff] and [defendant]'" (id., ¶ 58, quoting NYSCEF Doc No. 30). 
Defendant communicated similar representations directly to plaintiff: "'Being Forsythe the entity who holds 100% membership interest, all the net losses and net profits generated by Atlas are for Forsythe'" (id., ¶ 59, quoting NYSCEF Doc No. 31).
Additionally, plaintiff submits minutes of a November 23, 2021 meeting of the board of directors of Forsythe ("Forsythe Board"), showing that the parties discussed "a deal Atlas was actively negotiating with a third party whereby the third party would purchase several of Atlas' solar projects based in New York" (id., ¶ 63). Burt "had been actively involved" in the negotiations (id., ¶ 64), and the minutes include a Forsythe resolution "that Atlas be given approval to proceed with the [Kruger] transaction" (NYSCEF Doc No. 42).
The parties continued working together through June 2023, and at no point "did Torrent once take the position that the MITA had not been consummated, or that he had not been paid the nominal $1,000 purchase price set forth therein" (Complaint, ¶¶ 68-69). "Indeed, well into 2022, Torrent and Atlas continued to actively utilize and share with potential third-party business partners certain organizational charts documenting Forsythe's ownership of Atlas" (id., ¶ 71).
In July 2023, as "Atlas neared consummation of a potentially lucrative deal with a third party [Onyx] to purchase one of [its] New York-based solar projects," plaintiff allegedly discovered that defendant was holding himself out "as Atlas' sole member" (id., ¶¶ 91-92). 
Defendant eventually "informed [plaintiff], for the very first time in the nearly three years since Torrent had executed the MITA on behalf of both himself and Forsythe, that it was his position that the MITA was never effectuated because he had never received the nominal $1,000 payment from Forsythe" (id., ¶ 93). "Torrent told Burt that, as a result, 'Forsythe never became a 100% direct owner of Atlas and, as a result, [plaintiff] never became 50% indirect owner of Atlas'" (id., ¶ 94).
B. The Litigation
Plaintiff commenced this action on November 8, 2023 through the filing of a Complaint alleging six causes of action: (1) request for a declaration that Forsythe is the sole member of Atlas (direct and derivative); (2) breach of the MITA (derivative); (3) promissory estoppel (direct and derivative); (4) equitable estoppel (direct and derivative); (5) tortious interference with prospective advantage (derivative); and (6) fraud (direct and derivative) (see id., ¶¶ 103-164). 
Defendant joined issue on December 29, 2023 through an answer denying the pertinent allegations of the Complaint and interposing various defenses (see NYSCEF Doc No. 6).
The case proceeded to written discovery, and plaintiff learned that defendant had caused Atlas to sell a certain solar project to Onyx for $2,341,927 and distributed the sale proceeds to himself (see NYSCEF Doc No. 22 ["Burt Aff."], ¶¶ 77-82). Plaintiff further alleges that defendant "continues to pursue additional, potentially lucrative Atlas transactions solely for his own benefit" (id., ¶ 84).
Based on this newly-discovered information, plaintiff moved by OTSC, returnable on July 5, 2024, for a preliminary injunction: (i) restraining defendant from effectuating any further sales or transfers of the assets of Atlas without Forsythe's consent; and (ii) requiring defendant to deposit the proceeds of any such sales or transfers, including the proceeds of the Onyx sale, with the Court.
After reviewing the parties' written submissions, the Court scheduled an evidentiary hearing for August 8, 2024, based upon "the prima facie showing made by plaintiff and the sharp factual conflicts presented by the parties' affidavits" (NYSCEF Doc No. 98). 
At the August 8, 2024 appearance, however, the focus shifted to efforts directed at a consensual resolution of the motion. Although the parties reached a conceptual agreement, they could not arrive at a written stipulation. 
The preliminary injunction hearing was held over two days: September 6, 2024 and October 21, 2024 (see NYSCEF Doc No. 102 ["September 6th Tr."]; NYSCEF Doc No. 103 ["October 21st Tr."]). To expedite matters, the Court received the parties' affidavits as direct [*4]testimony under Commercial Division Rule 32-a, subject to limited oral supplementation, and deemed the documents annexed to the parties' affidavits to be part of the hearing record absent particularized objection (see September 6th Tr. at 3-5). Nine additional documents also were received into evidence at the hearing, largely for impeachment purposes (see Exs. 28-32, PP-SS).Post-hearing briefs were received on November 8, 2024 (see NYSCEF Doc Nos. 108-114).
Based on the credible testimony and documentary evidence adduced by the parties, the Court finds and determines as follows.
ANALYSIS
The purpose of a preliminary injunction is to maintain the status quo and prevent a final judgment from being rendered ineffectual (see Waldron v Hoffman, 130 AD3d 1239, 1239 [3d Dept 2015]). To obtain such relief, the movant "must establish, by clear and convincing evidence, three separate elements: (1) a likelihood of ultimate success on the merits; (2) the prospect of irreparable injury if the provisional relief is withheld; and (3) a balance of equities tipping in the moving party's favor" (Mangovski v DiMarco, 175 AD3d 947, 948 [4th Dept 2019] [internal quotation marks, alteration and citations omitted]; see Nobu Next Door, LLC v Fine Arts Hous., Inc., 4 NY3d 839, 840 [2005]; see also CPLR 6301). 
A. Likelihood of Success
A "party seeking a preliminary injunction must demonstrate a probability of success on the merits" (Nobu Next Door, 4 NY3d at 840). "The existence of a question of fact does not prevent a party from establishing a likelihood of success on the merits; success need not be a certainty to obtain a preliminary injunction" (Petry v Gillon, 199 AD3d 1277, 1278-1279 [3d Dept 2021] [internal quotation marks and citation omitted]). 
1. Plaintiff's Prima Facie Case
To demonstrate that Forsythe, not defendant, is the sole member of Atlas, plaintiff relies, first and foremost, on the Cooperation Agreement and the MITA. The clear and express terms of these signed writings demonstrate a joint venture to develop solar projects in the United States under a corporate structure whereby "Forsythe will hold 100% of all the US companies, entities and assets" (Cooperation Agreement, ¶ 6; see MITA, ¶ 4).
Plaintiff also submits documentary evidence showing that defendant represented that Atlas was wholly owned by Forsythe, and he acted in accordance with that representation following execution of the Cooperation Agreement and the MITA. This proof includes:
• Minutes of a December 3, 2020 meeting of the Forsythe Board regarding strategy and budgeting for Atlas solar projects (see NYSCEF Doc No. 25).
• A February 9, 2021 email from defendant to Forsythe's accountant confirming that Forsythe was the 100% owner of Atlas, which, in turn, owned the project-specific solar entities (see NYSCEF Doc Nos. 26-27).
• A March 15, 2021 email in which defendant represented to potential investors that "Atlas Renewables is our operational company for all our developments in USA. Atlas Renewables is 100% controlled by an overseas entity [Forsythe] which is 100% controlled by Ariel and myself" (NYSCEF Doc No. 30).
• Minutes of a March 18, 2021 meeting of the Forsythe Board showing review of "the schedule of [Forsythe's solar] project pipeline" and the company's finances, including loan agreements with Atlas (NYSCEF Doc No. 29).
• A March 21, 2021 email in which defendant commented to plaintiff on a proposed operating agreement for Atlas and the "roles of the Member/s and the Manager/s" (NYSCEF Doc No. 31). Defendant observed that the proposed agreement properly allocated "all the net losses and net profits generated by Atlas [to] Forsythe" because "Forsythe [is] the entity who holds 100% membership interest" (id.). Defendant further maintained that his proposal for an operating agreement was consistent with the "Cooperation Agreement" and "other critical aspects of the company" (id.).
• A March 21, 2021 spreadsheet of accrued expenses for Forsythe, reflecting the payment [*5]of Atlas expenses (see NYSCEF Doc Nos. 33-34).
• A March 30, 2021 email from defendant to an attorney with Barclay Damon, in which defendant represented to his putative counsel that "Atlas is a 100% subsidiary of Forsythe" (NYSCEF Doc No. 35) and supplied counsel with a PowerPoint slide confirming that structure (see NYSCEF Doc No. 36).
• A draft organizational chart sent by defendant to plaintiff in June 2021, again showing Forsythe to be the 100% owner of Atlas (see NYSCEF Doc Nos. 37-38).
• An extension of an exclusivity agreement for an Atlas solar project signed by the parties in November 2021 as directors of Forsythe (see NYSCEF Doc Nos. 40-41).
• Minutes of a November 23, 2021 meeting, at which the Forsythe Board resolved "that Atlas be given approval to proceed with the [Kruger asset purchase] transaction" (NYSCEF Doc No. 42).
The foregoing proof suffices to demonstrate, prima facie, that plaintiff is likely to succeed on her claims that Forsythe is the owner of Atlas or, alternatively, that defendant should be equitably estopped from denying Forsythe's ownership of Atlas.
2. Defendant's Opposition
Defendant argues principally that the MITA did not become effective because the closing at which his membership interest in Atlas was to be transferred to Forsythe "never took place" (NYSCEF Doc No. 58 ["Torrent Aff."], ¶ 44). The parties allegedly agreed on September 7, 2020 that the MITA would be "void" until such time as plaintiff was able to contribute financially to the venture (id., ¶ 47). Defendant further contends that Forsythe and plaintiff merely were advisors and service providers to Atlas, not owners or partners, and plaintiff was well-aware of defendant's sole ownership of Atlas.
a. The Alleged "Voiding" of the MITA
The MITA was signed by the parties on September 4, 2020. Defendant maintains that on September 7, 2020, just three days later, he "received a phone call from Burt, stating that she was not, after all, in a position to invest any funds into Atlas, and so could not go through with the closing" (id., ¶ 46). The parties allegedly "agreed and understood that, at least for the time being, the MITA, and the transfer contemplated therein, was void" (id., ¶ 47). "However, Burt remained interested in a partnership, and asked for a six-month reprieve in which to raise funds so as to be in a position to properly fund Atlas (and Forsythe) as was contemplated all along" (id., ¶ 46). Defendant claims to have documented the foregoing in the minutes of a "special meeting" of the member(s) of Atlas (id., ¶ 48; see NYSCEF Doc No. 70).
Plaintiff responds that defendant's "assertion is completely and utterly false. This alleged phone conversation never occurred. Defendant has invented it out of whole cloth" (NYSCEF Doc No. 89 ["Burt Reply Aff."], ¶ 4; see September 6th Tr. at 93). She insists that the same is true of defendant's "related claim to have granted [her] a six-month 'forbearance' or 'grace' period . . . . No such period was ever discussed . . . [or] existed" (Burt Reply Aff., ¶ 18).
If the parties had agreed to "void" the MITA or established an oral condition precedent to its effectiveness that was not fulfilled, Forsythe would not have a legitimate claim of ownership of Atlas. However, the Court finds reason to be skeptical of this defense.
First, the rationale proffered by defendant for plaintiff agreeing to "void" the MITA — her inability to "invest any funds into Atlas" or to "raise funds . . . to properly fund Atlas (and Forsythe)" (Torrent Aff., ¶ 46) — is not wholly convincing. The MITA did not itself impose any financial obligation on plaintiff, and Forsythe's only obligation was to pay defendant $1,000, a relatively nominal sum for which funds were available (see October 21st Tr. at 50-51).
More fundamentally, the parties' agreements recognized that their financial contributions to the venture would be unequal, at least in the short term. The Cooperation Agreement recites plaintiff's initial investment of $250,000, compared to defendant's initial investment of $783,718 (see Cooperation Agreement, ¶ 4). And the express terms of the Cooperation Agreement contemplated a substantial infusion of additional capital from defendant, a "commit[ment] to [*6]invest [$1 million] or more" (id., ¶ 5), with no corresponding expectation as to plaintiff.
At the hearing, defendant maintained principally that the Forsythe Shareholders' Agreement obliged plaintiff to match his investments in the venture. Specifically, defendant relied on the following language: "There is no obligation on the Shareholders to provide any finance to the Company but, if they do so, the Shareholders shall each provide such further finance in their respective Shareholding Proportions on the same terms unless they unanimously agree in writing" (Shareholders' Agreement, § 4.2). But while this language contemplates equal financing in the long term, the Shareholders' Agreement goes on to expressly recognize that, "[i]n the short term, the Shareholders . . . will be providing finance in different proportions" (id.).
In the absence of anything in the MITA, Cooperation Agreement or Shareholders' Agreement obliging plaintiff to make short-term financial contributions to the venture,[FN1]
it is difficult to understand why plaintiff would have agreed to "void" the MITA on financial grounds just three days after signing it, even assuming that changes in her personal circumstances made the task of securing financing more difficult and uncertain. 
Second, defendant's considerable efforts to obtain back-dated notarization of the MITA in the weeks following its execution would make little sense if it had been voided on September 7, 2020. On October 20, 2020, more than six weeks after the alleged oral agreement to "void" the MITA, defendant wrote to plaintiff complaining that he had contacted six different notaries in Hong Kong before deciding to abandon the notarization requirement (see NYSCEF Doc No. 90).
Third, there is little, if any, evidence to corroborate defendant's claim of an oral agreement to "void" the MITA or condition its effectiveness. The alleged agreement is referenced in only one document: the minutes of a "special meeting of the Members of Atlas" held on September 11, 2020, at which only defendant was present (NYSCEF Doc No. 70). These minutes purport to memorialize "a phone conversation between Burt and Torrent [from] September 7, 2020," during which "Burt confirmed that she was not in a position to start injecting from her personal funds or companies under her control the 50% of the expected amounts to cover the development costs of the solar projects" and requested "a 6-month period to financially recover herself" (id.). However, there is no evidence that these minutes were circulated to plaintiff or anyone else prior to this litigation (see Burt Reply Aff., ¶¶ 14-15).
The Court is troubled by the absence of any corroborating documentation, apart from the uncirculated minutes of a meeting that defendant had with himself. Having reviewed a large collection of emails, presentations, meeting minutes and business documents sent and received by defendant, it is apparent that he is a careful businessperson who is concerned about conducting his affairs with the requisite formality and proper documentation (see October 21st Tr. at 129 ["In my private practice, I try to be upright, and I try to memorialize things."]).
Given the detailed documentation of so many aspects of the parties' business dealings with each other and with third parties, the absence of any writing memorializing or even referring to an agreement between the parties to void or condition the MITA is puzzling.
Finally, defendant has not adequately explained his representations that Forsythe was the 100% owner of Atlas or his actions referrable to that ownership. Defendant insisted that it would have been inappropriate for him to have aired the parties' "dirty laundry" to third parties, and he simply was "[trying] to protect plaintiff" by keeping private the voiding of the MITA (and her personal circumstances) (see id. at 72-73). But this rationale does not provide a convincing basis for withholding basic information about Atlas and its corporate structure from trusted legal and financial advisers. After all, it would make little sense to obtain legal and finance advice for Atlas and Forsythe based only on the "hope that the MITA would, after all, be effectuated" [*7](Torrent Aff., ¶ 71).
Nor has defendant offered a convincing explanation for conduct on his part consistent with Forsythe's ownership of Atlas. For example, plaintiff submits the minutes of a November 23, 2021 meeting at which the Forsythe Board, consisting of the parties, resolved to give Atlas approval to proceed with the Kruger transaction (see NYSCEF Doc No. 42). Defendant was asked at the hearing why the Forsythe Board would have resolved to give Atlas approval to proceed with the transaction if defendant was Atlas's owner and Forsythe merely an advisor. Defendant vaguely responded that he did not recall the meeting and that the meeting minutes were not circulated to him (see October 21st Tr. at 86-90). However, a third person, Adam Hopkin, attended the meeting and served as "recording secretary" (NYSCEF Doc No. 42). 
b. Roles of Forsythe and Plaintiff in the Venture
Defendant contends that Forsythe was formed to "provide advisory services" to Atlas (Torrent Aff., ¶¶ 22-23), and plaintiff was a salaried employee or service provider to Forsythe, not a partner in Atlas or joint venturer (see id., ¶ 63).
Plaintiff's contention that the parties "contemplated that [they] would co-own a foreign entity [Forsythe], which would in turn own a U.S.-based entity [Atlas] to house [the] various individual solar projects" (Burt Reply Aff., ¶ 35) is reflected in the express terms of the Cooperation Agreement:
A parent company in Bermuda named 'Forsythe' will be held 50/50 by LT and AXB. In any case Forsythe will hold 100% of all of the US companies, entities and assets. So therefore, it is currently foreseen that the Bermuda company holds 100% of the Delaware company 'Atlas Renewables' which holds an LLC for each 6.5MWdc solar asset (Cooperation Agreement, ¶ 6).
Forsythe's role as Atlas's owner also is confirmed by the minutes of the first meeting of the Forsythe Board, held on August 14, 2020, which recite that "Atlas has been incorporated in the United States of America to act as a holding vehicle for the individual solar projects. Atlas is currently owned by LT and the ownership needs to be transferred 100% to [Forsythe]" (NYSCEF Doc No. 97 at 2). The Forsythe Board therefore "RESOLVED that LT be and is hereby authorized to do such further acts and things as is necessary to transfer the ownership of Atlas to [Forsythe]," at which time "the costs of Atlas will be borne by [Forsythe]" (id.; see also Ex. PP [Atlas resolution "that (its) 100% membership interest . . . will be transferred to Forsythe"]).
As to her own role in the venture, plaintiff points to the Cooperation Agreement, which is an agreement between principals. Further, plaintiff attests that her salary from Forsythe was for serving as the chief executive of Forsythe (see Burt Reply Aff., ¶¶ 40, 42-44; see also NYSCEF Doc No. 97 at 3).
Defendant further contends that, by September 2021, he had become frustrated with plaintiff's lack of contribution to the venture and "proposed that Burt be paid a success fee of up to a maximum of five percent — to be determined at [his] discretion — of the proceeds received by Atlas as a result of any transaction in which Burt played a significant role" (Torrent Aff., ¶ 79). "By early 2022, Burt was paid $81,000 in total as compensation for her role with respect to the [2021] Kruger transaction, as a five-percent success fee" (id., ¶ 84). 
Plaintiff denies defendant's assertions regarding a "success fee," stating that the Kruger payment "was a function of [her] ownership interest in Atlas' parent company, Forsythe, not some non-existent discretionary 'success fee' controlled by Defendant" (Burt Reply Aff., ¶ 48).
At the hearing, defendant insisted that the $81,228.91 paid to plaintiff for the Kruger transaction represented a discretionary 5% success fee. However, it appears from the spreadsheet submitted into evidence by defendant (see Ex. SS) that net proceeds of the sale, following payment of loans and expenses, were allocated between the parties in a pro rata fashion relative to their investments into Forsythe, with plaintiff's proportionate share determined by reference to her initial $250,000 investment (see id.; Cooperation Agreement, ¶ 4). Thus, the Kruger payout appears to support plaintiff's claim of an equity interest in Atlas.
[*8]c. The February 9, 2021 PowerPoint Slide
Plaintiff submitted a February 9, 2021 email from defendant to Forsythe's accountant that included a PowerPoint slide depicting Forsythe as the 100% owner of Atlas (see NYSCEF Doc Nos. 26-27; see also Part A [2] [a], supra). Defendant did not offer a credible explanation for making this representation to Forsythe's accountant, but he does seize on plaintiff's apology to the accountant for her delay in responding to his December 2020 inquiry, which plaintiff ascribed to the parties' need to develop an "overall company structure" and determine "exactly how [they] are going to run the set up for the long term" (NYSCEF Doc No. 26 at 3). This, defendant argues, "is a clear sign that the MITA signed in early September 2020 had not gone into effect," as "there would have been no need for Burt to write such emails" (Torrent Aff., ¶ 70).
Plaintiff responds that the structuring issues to which she referred had nothing to do with the MITA or Forsythe's ownership of Atlas (see Burt Reply Aff., ¶¶ 24-26). The issues instead "related to questions [the parties] had been exploring around that time regarding the corporate relationship between Forsythe and the various solar project-specific LLCs [formed] to house individual solar projects" (id., ¶ 26). More specifically, the structural issues concerned whether the project-specific holding vehicles should be owned by Forsythe or Atlas (see id., ¶¶ 27-32).
Based on the emails and the credible testimony adduced at the hearing, the Court finds that defendant is unlikely to succeed on this point.
d. Documents Referring to Defendant as Atlas's Sole Member
Plaintiff claims that defendant's May 8, 2023 email (see NYSCEF Doc No. 83) was the first time she observed defendant "misrepresenting himself as Atlas' sole member" (Burt Reply Aff., ¶ 53), and she was "shocked" by what she read (id., ¶ 54). However, defendant submits proof showing that plaintiff had received similar emails on a number of occasions since October 2020 and acted upon some of them without objection. Further, some of the emails were copied to others within the venture, including a legal advisor to Forsythe, and none of the recipients objected to defendant's representations that he was the sole member of Atlas or claimed that such representations were inconsistent with the MITA.
Defendant first submits an October 20, 2020 email from defendant to Atlas's engineering consultant, representing the following: "Currently, the only member of Atlas Renewables LLC is myself" (Ex. 29 at 106326.5). That email eventually was forwarded to plaintiff on October 30, 2020 as part of a long chain (see id. at 106326.1-106326.2).
Defendant also submits an email with numerous attachments sent by plaintiff to Clarien Bank on March 16, 2021 to open an account for Atlas (see Ex. 30). Plaintiff's email states that the attached documents, which had been forwarded to her, are "certified copies of the documents of Atlas Renewables [LLC]," as "seen in original by the legal department, legal head, Andreas Escher" (id. at 102841.1). Among these documents are: (i) a Statement of Authorized Person, dated January 13, 2020, showing defendant to be the sole member of Atlas (see id. at 103172.2); and (ii) a direct representation to the bank that defendant was the 100% owner of Atlas (see id. at 103340.1 ["Seen and certified by Andreas Escher, Legal Dept., Forsythe Ltd."]).
In November 2021, plaintiff was copied on a long series of emails between Atlas's counsel and Kruger's counsel in connection with their efforts to finalize a purchase agreement (see NYSCEF Doc Nos. 78-82). Annexed to the emails were the "Minutes of Special Meeting of Members" of Atlas, at which defendant, "the only member of the Company," resolved to approve the Kruger transaction (see NYSCEF Doc No. 78, final page; see also Torrent Aff., ¶ 81).
When confronted with these documents, plaintiff took the position that she was relying on Atlas's counsel and defendant to protect the interests of Forsythe and Atlas, and she "did not closely monitor these emails or their . . . attachments" (Burt Reply Aff., ¶¶ 60-61; see September 6th Tr. at 36 ["I didn't see (the language in) Ex. 29) at the time, I would have said something"]; 42 ["I relied on the accuracy of the documents that (defendant) had given me"]; 50 ["mistake"]; 55 ["I didn't see it . . . and I was relying on our counsel"]). If plaintiff had contemporaneously observed defendant's representations that he was the sole owner of Atlas, she claims that she "would have objected and sought to correct Defendant's error, as [she] did later when [she] [*9]noticed Defendant making similar representations" in the May 8, 2023 email (id., ¶ 63).
The Court is not convinced by plaintiff's explanations. She was the chief executive of Forsythe and, as such, was responsible for protecting Forsythe's assets (see September 6th Tr. at 11, 60) — the most substantial of which is Forsythe's alleged 100% ownership interest in Atlas. This does not appear to have happened, at least with respect to the opening of Atlas's bank account and the 2021 Kruger transaction.[FN2]

Moreover, as defendant observes, the documents and communications at issue were copied to, and in some cases certified by, Andreas Escher, who played some role in Forsythe's legal department. If Escher (or others within the venture) were "very much aware that Forsythe is the one hundred percent owner of Atlas" (id. at 36), it is unclear why an objection was not raised to defendant's representations regarding Atlas's ownership. 
3. Conclusions
Plaintiff presented credible and persuasive documentary evidence showing that: (i) the parties agreed to a joint venture to develop solar projects in the United States through Forsythe, a Bermuda entity they own equally; (ii) in furtherance of that venture, defendant agreed to transfer ownership of Atlas to Forsythe for the nominal sum of $1,000; and (iii) defendant's words and conduct over a multi-year period evidenced the transfer and Forsythe's resulting 100% ownership of Atlas.
In opposition, defendant attempts to characterize Forsythe's role as that of an advisor to Atlas and plaintiff's role as that of an employee or service provider, but these characterizations are inconsistent with the parties' written agreements.
Defendant also contends that plaintiff agreed to "void" the MITA just three days after signing it, but there are good reasons to be skeptical of this defense. Plaintiff may well have communicated to defendant some changes in her personal circumstances affecting the venture, but the idea that plaintiff would have given up on the joint venture and the MITA so quickly and without a fight does not seem plausible.
But defendant has raised a serious issue through the emails circulated to plaintiff and others within the venture representing defendant as the sole member of Atlas. The notion that Forsythe's chief executive would not review or be familiar with the contents of important business documents is troubling, and defendant's proof also raises the question of why others within Forsythe, including its "legal officer," would not have corrected defendant's alleged misstatements.
The problem for defendant, though, is that he repeatedly misrepresented the ownership of Atlas. Sometimes he claimed to be the 100% owner of Atlas; at other times, he represented that Forsythe was the 100% owner. Defendant attempts to explain away the latter representations as a reflection of the parties' hopes and aspirations that the MITA would one day become effective and a good-faith effort to avoid airing plaintiff's "dirty laundry," but this does not appear to be the whole truth.
Ultimately, the Court is unable to reconcile the conflicting, and sometimes incredible, testimony of the parties based on the motion record, which was compiled at an early stage of the litigation with the benefit of only limited written discovery and with only the parties as witnesses. Nonetheless, the Court finds that plaintiff's testimony more closely aligns with the pertinent documentary evidence, including the parties' signed writings, and that the documentary evidence should be given primacy at this juncture.
The Court therefore finds that plaintiff has demonstrated a likelihood of success on her claim that Forsythe is the owner of Atlas.
[*10]B. Irreparable Harm
A movant for a preliminary injunction must establish that it is likely to suffer imminent and irreparable harm absent the requested relief. Irreparable harm means an injury for which a monetary award alone cannot be adequate compensation (see Town of Liberty Volunteer Ambulance Corp. v Catskill Regional Med. Ctr., 30 AD3d 739, 740 [3d Dept 2006]).
Plaintiff argues that she and Forsythe are suffering, and will continue to suffer, two forms of irreparable harm without the requested injunction: (i) loss of the right to participate in the business of Atlas, and (ii) the prospect that defendant will continue to divert funds from Atlas.
Interference with a party's right to "participate in the ownership and management of" a business may constitute irreparable harm (CanWest Global Communications Corp. v Mirkaei Tikshoret Ltd., 9 Misc 3d 845, 860, 872 [Sup Ct, NY County 2005]; see Yemini v Goldberg, 60 AD3d 935, 937 [2d Dept 2009]; Rakhman v Maltsev, 2021 NY Misc LEXIS 6628, *17 [Sup Ct, Nassau County 2021]; Bank of Am., N.A. v PSW NYC LLC, 29 Misc 3d 1216[A], 2010 NY Slip Op 51848[U], *10-11 [Sup Ct, NY County 2010]; see also Wisdom Imp. Sales Co., L.L.C. v Labatt Brewing Co., 339 F3d 101, 114-115 [2d Cir 2003]).
A preliminary injunction also may be warranted to maintain the status quo where "a substantial amount of money may be dissipated or [rendered] unavailable for recovery" (Sau Thi Ma v Xaun T. Lien, 198 AD2d 186, 186 [1st Dept 1993], lv dismissed 83 NY2d 847 [1994]; see Matter of James v iFinex Inc., 2019 NY Misc LEXIS 2484, *17 [Sup Ct, NY County 2009]).
The Court is satisfied that a preliminary injunction restraining defendant from effectuating any further sales or transfers of the assets of Atlas without the consent of Forsythe is necessary to avert imminent and irreparable harm to Forsythe's right to participate directly in the ownership and control of Atlas and plaintiff's right to participate indirectly through her interest in Forsythe. Contrary to defendant's contention (see NYSCEF Doc No. 87 at 24), an eventual award of money damages, even if collectible, will not fully compensate Forsythe and plaintiff for these losses. And while defendant argues that the requested injunction accords plaintiff "the ultimate relief" that she is seeking (id.), the last peaceable status quo appears to have involved the Forsythe Board consenting to the sale of Atlas assets (see NYSCEF Doc No. 42).
Inasmuch as Forsythe's consent will be required for any future sales of Atlas's assets, the Court finds it unnecessary to require the sales proceeds to be escrowed. The disposition of the sales proceeds is an issue that can be addressed in the first instance by the parties in the context of procuring Forsythe's consent to a particular transaction.
Finally, plaintiff has failed to demonstrate that a preliminary injunction requiring defendant to escrow the proceeds of the completed Onyx sale is necessary to avert imminent and irreparable harm. The decision to move forward with the Onyx sale was made more than one year ago, and the sale proceeds already have been disbursed, largely to pay back loans associated with Atlas assets conveyed to Onyx (see October 21st Tr. at 109-115). Plaintiff has not adequately established on the present record that such payments constitute a misuse or improper diversion of funds, even if sent to overseas entities controlled by defendant. And, in any event, plaintiff has not established the clear likelihood of success necessary to warrant a mandatory preliminary injunction directing the return of previously disbursed funds.
C. Balancing of the Equities
A preliminary injunction is an equitable remedy that will be granted only where the balance of equities tips in favor of the requested relief. "The probability of hardship to each of the parties from the grant or denial of the application must be weighed in the balance" (Finger Lakes Health Sys. Agency v St. Joseph's Hosp., 81 AD2d 403, 408 [3d Dept 1981], lvs denied 55 NY2d 606, 607 [1982]).
The Court finds that the balance of equities tips in favor of plaintiff and issuance of a preliminary injunction. Absent an injunction, it is likely that the assets of Atlas will be sold during the pendency of this litigation and the proceeds sent to overseas entities controlled by defendant. A preliminary injunction therefore is necessary to maintain the status quo and prevent a potential judgment in favor of plaintiff from being rendered ineffectual (see Waldron, 130 [*11]AD3d at 1239).
However, the equities do not favor a preliminary injunction being misused to limit Atlas's access to needed funds or to hamper its successful operations (see NYSCEF Doc No. 87 at 24-25). Accordingly, Forsythe's consent to a proposed sale or transfer of Atlas assets shall not be unreasonably withheld. If Forsythe refuses to consent to a proposal for the sale of Atlas assets within a reasonable time, defendant may apply for relief from the preliminary injunction as to the proposed transaction.
D. Undertaking
A party obtaining a preliminary injunction must "give an undertaking in an amount to be fixed by the court, that the [movant], if it is finally determined that he or she was not entitled to an injunction, will pay to the [enjoined party] all damages and costs which may be sustained by reason of the injunction" (CPLR 6312 [b]). 
"The amount of the undertaking is left to the court's sound discretion, but it should bear some rational relation to the potential damages that the [restrained party] would suffer if the preliminary injunction is ultimately deemed unwarranted" (Darwish Auto Group, LLC v TD Bank, N.A., 224 AD3d 1115, 1119 [3d Dept 2024] [citations omitted]). 
Given the structure of the preliminary injunction ordered herein, the Court finds that defendant has failed to establish the prospect of more than nominal damages. Accordingly, the undertaking shall be fixed at $10,000. However, in the event that Forsythe refuses to approve a sale or transfer proposed by defendant and defendant applies for relief from the preliminary injunction with respect to that proposal, defendant may request an increase in the undertaking to reflect the additional damages associated with continued restraint of the proposed transaction.
CONCLUSION
Based on the foregoing,[FN3]
it is
ORDERED that defendant Lluis Torrent Jerez is enjoined and restrained from effectuating any further sales or transfers of the assets of Atlas Renewables LLC without the written consent of Forsythe Ltd.; and it is further
ORDERED that plaintiff shall post an undertaking in the amount of ten thousand dollars ($10,000); and finally it is
ORDERED that defendant may apply to modify the preliminary injunction and undertaking in accordance with the foregoing.
This constitutes the Decision & Order of the Court, the original of which is being uploaded to NYSCEF for entry by the Albany County Clerk. Upon such entry, counsel for plaintiff shall promptly serve notice of entry on all parties entitled to such notice.
Dated: November 20, 2024
Albany, New York
RICHARD M. PLATKIN
A.J.S.C.
Papers Considered:
NYSCEF Doc Nos. 1-3, 18-55, 57-98, 102-114.

Footnotes

Footnote 1: Even the six-month forbearance period claimed by defendant appears to fall comfortably within the parties' agreement to provide financing in different proportions in the short term.

Footnote 2: The Court declines to attach significance to Ex. 29, as that email was sent while the MITA was in the process of being formalized, and defendant's representation was qualified to "[c]urrent[]" circumstances.

Footnote 3: To the extent not expressly discussed, the parties' remaining arguments and requests for relief have been considered and found to be lacking in merit and/or unnecessary to entertain given the disposition reached herein.